NORTHMEADOW TENNIS CLUB, INC. *vs*. NORTHEASTERN FIRE
INSURANCE COMPANY OF PENNSYLVANIA & others.[1]

No. 87-1208.

Middlesex.    May 13, 1988. — August 22, 1988.

Present: PERRETTA, DREBEN, & KASS, JJ.

*Insurance,* Insolvency of insurer, Liability insurance, Coverage, Construc-
tion of policy. *Contract,* Insurance. *Practice, Civil,* Appeal.

A policy of excess liability insurance "dropped down" to provide coverage
upon the insolvency of the primary insurer where the language of the
policy was susceptible to the interpretation that coverage would be pro-
vided in the eventuality of the primary insurer being "held liable to pay"
but being unable to do so. [332-333]

A policy of excess liability insurance did not "drop down" to provide
coverage upon the insolvency of the primary insurer where the language
of the policy unambiguously insured against reduction of the underlying
policies only by reason of out-of-pocket payments for losses by the
lower level insurers. [333-334]

CIVIL ACTION commenced in the Superior Court Department
on January 6, 1986.

The case was heard by *Hiller B. Zobel,* J., on a motion for
summary judgment.

*Susan Hughes Banning* for Jefferson Insurance Company of
New York.

*Edward W. Waystack* for Fireman's Fund Insurance Com-
pany.

*Herbert D. Lewis (Morris Kirsner* with him) for the plaintiff.

*Michael Najjar,* for Charles E. McPhail, amicus curiae,
submitted a brief.

KASS, J. At the time of the alleged tort — serving alcohol
to an inebriate — Northmeadow Tennis Club, Inc. (Tennis

---

[1] Jefferson Insurance Company of New York, Fireman's Fund Insurance
Company, and Charles E. McPhail, administrator.

Club), was insured under three general liability policies: *first*, a primary policy with limits of $300,000; *second*, an excess insurance policy with limits of $200,000 above the base coverage, i.e., up to $500,000; and *third*, an excess insurance policy for the layer of liability between $500,000 and $1,000,000. During the pendency of the underlying action against the Tennis Club, the primary insurer, Northeastern Fire Insurance Company of Pennsylvania became insolvent, thus provoking a new chapter in the discussion of the subject considered in *Massachusetts Insurers Insolvency Fund* v. *Continental Cas. Co.*, 399 Mass. 598 (1987), and *Gulezian* v. *Lincoln Ins. Co.*, 399 Mass. 606 (1987). That subject is: shall the excess insurance carriers "drop down," i.e., provide coverage for the insured beginning with the first dollar of the insured's liability?

The Tennis Club has brought a declaratory judgment action (G. L. c. 231A) to establish the liability of, respectively, the first excess carrier, Jefferson Insurance Company of New York (Jefferson), and the second excess carrier, Fireman's Fund Insurance Company (Fireman's). A judge of the Superior Court determined that both policies drop down. Specifically, Jefferson is bound to indemnify the Tennis Club for the first $200,000 of liability which it incurs; and Fireman's is bound for the next $500,000. The Tennis Club, on that construction of the policies, has $700,000 in coverage as to any judgment against it in favor of the party who brought the dram shop liability action, the administrator of the estate of Deborah L. McPhail. We conclude that the Jefferson policy drops down but that the Fireman's policy does not.

From the *Continental Casualty* and *Lincoln Insurance* decisions several guidelines emerge for grappling with the question whether an excess coverage policy in effect insures against the insolvency of the primary carrier: there is no overriding principle or policy involved; the reasonable expectations of the buyer of the insurance policy can be taken into account in construing the insurance contract, but they are not decisive; in the final analysis the language of the particular insurance policy is determinative; ambiguities in the policy on the drop-down issue will be resolved against the insurer; policies which contain

references to "collectible" primary insurance will be construed to cover the event of insolvency; and a policy that says without limitation that it drops down when the primary coverage is reduced provides first dollar coverage should the primary insurer become insolvent. *Massachusetts Insurers Insolvency Fund* v. *Continental Cas. Co.*, 399 Mass. at 600-601. *Gulezian* v. *Lincoln Ins. Co.*, 399 Mass. at 608-612. We do not read these opinions as expressing the broad proposition that the Tennis Club and McPhail find in them, viz., that in the absence of language expressly negating such liability, excess carriers drop down to the next lowest level of liability created by reason of the insolvency of a lower-level insurer.[2]

In screening the policy in each case for ambiguity and resolving the ambiguity against the company, the *Continental* and *Lincoln* cases fall in line with several State jurisdictions which have taken a similar approach, particularly when the policies in question contained language which limited the excess carrier's liability to that in excess of other "collectible" or "recoverable" insurance. See *Reserve Ins. Co.* v. *Pisciotta*, 30 Cal. 3d 800, 814-815 (1982); *Donald B. MacNeal, Inc.* v. *Interstate Fire & Casualty Co.*, 132 Ill. App. 3d 564, 567-568 (1985); *Werner Indus., Inc.* v. *First State Ins. Co.*, 217 N.J. Super. 436, 444-445 (1987), further app. rev. granted, 108 N.J. 585 (1988); *Gladstone* v. *D.W. Ritter Co.*, 133 Misc.2d 922, 927-928 (N.Y. Sup. Ct. 1986).

Among the considerably greater number of cases from other jurisdictions which have held that the excess carrier did *not* slip into the shoes of insolvent primary insurers, some have focused on language in the excess policies which provided that reduction or exhaustion of the limits of the primary policy could occur solely by reason of "losses paid thereunder." Insol-

---

[2] However rare insolvency of an insurance company may once have been, the number of cases which deal with the consequences of insurer insolvency has become sufficiently large so that those consequences ought to be dealt with expressly in an insurance contract. "It seems likely that Lincoln did not contemplate the insolvency of a scheduled underlying insurer in drafting its policy. . . . The result is that Lincoln issued a policy in which it generated uncertainty as to what should happen on the insolvency of a primary insurer." *Gulezian* v. *Lincoln Ins. Co.*, 399 Mass. at 612.

vency was, thus, impliedly excluded as a permissible ground for reduction in the primary insurance. See *Molina* v. *United States Fire Ins. Co,* 574 F.2d 1176, 1178 (4th Cir. 1978); *Continental Marble & Granite* v. *Canal Ins. Co.,* 785 F.2d 1258, 1259 (5th Cir. 1986); *Mission Natl. Ins. Co.* v. *Duke Transp. Co.,* 792 F.2d 550, 552-554 (5th Cir. 1986); *Steve D. Thompson Trucking, Inc.* v. *Twin City Fire Ins. Co.,* 832 F.2d 309, 310 (5th Cir. 1987); *Zurich Ins. Co.* v. *The Heil Co.,* 815 F.2d 1122, 1124-1126 (7th Cir. 1987); *Guaranty Natl. Ins. Co.* v. *Bayside Resort, Inc.,* 635 F. Supp. 1456, 1459 (D.V.I. 1986); *Prince Carpentry, Inc.* v. *Cosmopolitan Mut. Ins. Co.,* 124 Misc.2d 919, 930-931 (N.Y. Sup. Ct. 1984); *Value City, Inc.* v. *Integrity Ins. Co.,* 30 Ohio App. 3d 274, 277-278 (1986).

Other courts have considered as dispositive or weighty the premise that companies which write excess or umbrella insurance ought not be required to analyze the financial stability of primary insurers and that requiring the excess carriers to assume the burdens of insolvent primary coverage adds a risk not considered or assumed in the insurance marketplace. *Continental Marble & Granite* v. *Canal Ins. Co.,* 785 F.2d at 1259; *Steve D. Thompson Trucking, Inc.* v. *Twin City Fire Ins. Co.,* 832 F.2d at 311; *Zurich Ins. Co.* v. *The Heil Co.,* 815 F.2d at 1126; *Wurth* v. *Ideal Mut. Ins. Co.,* 34 Ohio App. 3d 325, 328 (1987).

1. *The Jefferson policy.* After stating that the insurance company agrees to indemnify the Tennis Club for liability incurred by reason of accidents which occur during the policy period, the Jefferson policy provides that Jefferson's liability shall attach only after the primary insurers "have paid or have been held liable to pay the full amount of their respective ultimate net loss."[3] The phrase "held liable to pay," if not regarded as surplusage (there is no reason to do so, see *National Shawmut Bank* v. *Joy,* 315 Mass. 457, 466 [1944]), posits an eventuality in which the insured, and hence the primary insurer, are liable but the insurer for some reason has not paid. The case of insol-

---

[3] The full text of pertinent provisions in Jefferson's policy is appended to this opinion in Appendix A.

vency would be such an eventuality. At least the policy is susceptible of that interpretation. Applying the principle of the *Continental* and *Lincoln* cases (399 Mass. at 600-601 & 608-612) that the ambiguity, if not fanciful, shall be resolved against the insurance company, we conclude that Jefferson is liable to the limits of its policy, beginning with the first dollar of the Tennis Club's liability, if any. It has not escaped our notice that the Jefferson policy presupposes primary insurance in force. See the last paragraph of Appendix A to this opinion. The same was true, however, of the policies in the *Continental* and *Lincoln* cases, and that language alone did not avail the insurance companies which issued them.

The insurance Jefferson sold was $200,000 of excess coverage above the scheduled primary insurance of $300,000. We do not think this translates, as the Tennis Club has argued, into responsibility for the aggregate of $500,000 in coverage. The limit of Jefferson's exposure is the $200,000 worth of insurance it sold. Moreover, the Tennis Club has not appealed from the judgment below and cannot secure a better judgment on appeal. *Goldman* v. *Kane*, 3 Mass. App. Ct. 336, 342 (1975).

2. *The Fireman's policy.* Fireman's policy provides that the company shall be liable for the excess over primary insurance or, as to "any claim . . . to which no primary policy applies," the excess over the greater of "any other insurance available to the insured" or the "retained limits" (i.e., the amount represented by the insured as its primary insurance) which "shall be considered self insurance within the meaning of" the policy.[4] As appears to be the mode of insurance contracts, the language is at a high level of abstraction. There can be no plausible reading of the language just described, however, other than that Fireman's means to insure over the underlying insurance and, if for some reason that underlying insurance is not there, that is to be the responsibility of the policyholder, not the insurance company.

---

[4] The full text of pertinent provisions in Fireman's policy is appended to this opinion in Appendix B.

In a subsequent provision, the Fireman's policy contemplates the possibility of "reduction or exhaustion of the applicable aggregate limit or limits of liability under said primary policy or policies solely by reason of losses paid thereunder on account of occurrences during this policy period . . . ." In that event, the company agrees to pay the excess over the reduced limit, as if it were the primary insurer. The "occurrences" which may give rise to reduction or exhaustion of the underlying policies are defined in the Fireman's policy as an "accident . . . which results in personal injury or property damage."

Under § 11 of the conditions set forth in the Fireman's policy, the insured is required to maintain the primary policies in amounts not less than those stated at the inception of the Fireman's policy. If there is a change in the scope of the underlying policies, § 11 provides that the Fireman's policy shall apply "in the same manner as though such primary policies and limits of liability . . . had been in effect, so maintained and unchanged."

In a variety of ways, therefore, the Fireman's policy states that it presupposes primary insurance being in force and that if it is not in force, the insured is responsible for the lower levels of damage, as if it were a self-insurer. The policy is unambiguous in that it insures against the reduction of the underlying policies only by reason of out-of-pocket payments for losses by lower level insurers. Our construction of the policy language is consistent with the interpretation of similar language in the policies considered in: *Molina* v. *United States Fire Ins. Co.*, 574 F.2d at 1178; *Steve D. Thompson Trucking, Inc.* v. *Twin City Fire Ins. Co.*, 832 F.2d at 310-311; *Mission Natl. Ins. Co.* v. *Duke Transp. Co.*, 792 F.2d at 551-553; *Zurich Ins. Co.* v. *The Heil Co.*, 815 F.2d at 1124-1125; *Guaranty Natl. Ins. Co.* v. *Bayside Resort, Inc.*, 635 F. Supp. at 1458-1459.

The judgment shall be amended to declare that Jefferson Insurance Company of New York is liable for the first $200,000 payable by Northmeadow Tennis Club, Inc., on account of claims arising out of the death of Deborah L. McPhail, and that Fireman's Fund Insurance Company is liable for amounts

so payable by Northmeadow Tennis Club, Inc., in excess of $500,000, up to a limit of $1,000,000.

*So ordered.*

Northmeadow Tennis Club, Inc. *v*. Northeastern Fire Ins. Co. of Pennsylvania.

APPENDIX A.

JEFFERSON'S POLICY

"A. - *Bodily Injuries Liability*. The Company hereby agrees, subject to the terms, conditions and limitations hereinafter mentioned, to indemnify the Insured in respect of accidents occurring during the policy period for any and all sums which the Insured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay to any person or persons . . . as damages for bodily injuries accidentally sustained, including death at any time resulting therefrom, by reason of the Insured's operations as shown in Item 1 of the Declarations and as more fully described in the underlying policy/ies issued to the Insured by the Primary Insurers, as shown in Item 3 of the Declarations.

Provided always that it is expressly agreed that liability shall attach to the Company only after the Primary Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss [1] liability as shown in Item 3 of the Declarations, (hereinafter called the Primary Limits), and the Company shall then be liable to pay only such additional amounts as will provide the Insured with a total coverage under the policy of the Primary Insurers and this Policy combined of the amounts shown in Item 4 of the Declarations."

The policy then sets forth the following conditions which further describe Jefferson's liability under the policy:

"*Attachment of Liability*. Liability under this Policy shall not attach unless and until the Primary Insurers shall have admitted liability for the Primary Limit or Limits, or unless or until the Insured has by final judgment been adjudged to pay a sum which exceeds such Primary Limit or Limits.

and

"*Maintenance of Primary Insurance*. This Policy is subject to the same warranties, terms and conditions (except as regards the premium, the obligation to investigate and defend, the amount and limits of liability and the renewal agreement, if any, and except as otherwise provided herein) as are contained in or as may be added to the policy/ies of the Primary Insurers prior to the happening of an accident for

---

[1] "Ultimate Net Loss" is defined in the policy as: [T]he sums paid in settlement of losses for which the Insured is liable after making deductions for all recoveries, salvages and other insurances (other than recoveries under the policy/ies of the Primary Insurers), whether recoverable or not, and shall exclude all expenses and "costs."

which claim is made hereunder and should any alteration be made in the premium for the policy/ies of the Primary Insurers during the currency of this Policy, then the Premium hereon shall be adjusted pro rata.

"It is a condition of this Policy that the policy/ies of the Primary Insurers as described in Item 3 and/or Item 5 hereof shall be maintained in full effect during the currency of this Policy."

### Appendix B.

### FIREMAN'S POLICY

"II. LIMIT OF LIABILITY

"The company shall be liable only for the limit of liability stated in the declarations in excess of:

(1) The limit or limits of liability of the applicable primary policy or policies all as stated in the declarations of this policy, or

(2) Under Coverages A & B as respects any claim or suit to which no primary policy applies, the greater of either

(a) the applicable limit or limits of liability of any other insurance available to the insured, or

(b) the amount stated in the declarations as the Insured's Retained Limit, which shall be considered self insurance within the meaning of this Insuring Agreement, and the limit of liability stated in the declarations as applicable to "each occurrence" shall be the total limit of the Company's liability for all damages sustained as a result of any one occurrence, provided, however, in the event of reduction or exhaustion of the applicable aggregate limit or limits of liability under said primary policy or policies solely by reason of losses paid thereunder on account of occurrences during this policy period, this policy shall (i) in the event of reduction, apply as excess of the reduced limit of liability thereunder, and (ii) in the event of exhaustion, continue in force as though it were primary insurance."

### "CONDITIONS"

"§ 11. *Maintenance of primary insurance.* Insurance afforded by the primary policies described in item 6 of the declarations with limits of liability not less than as stated in item 6 of the declarations, or renewals or replacements thereof not more restricted, shall be in full effect at the inception of this policy and shall be maintained during the period of this policy, except for reduction of aggregate limits solely as a result of payment of claims

arising out of occurrences during this policy period. If such primary insurance is not maintained in full effect by the Insured, or if any limits of liability of a primary policy are less than that stated in item 6 of the declarations, or if there is any change in the scope of coverage under any primary insurance, the insurance afforded by this policy shall apply in the same manner as though such primary policies and limits of liability as stated in item 6 had been in effect, so maintained and unchanged."

## "DEFINITIONS"

" § 3. *Insured's Retained Limit*. The limit stated in Item 4 of the declarations is self insurance for sums paid as damages in settlement of any claim or suit to which this policy applies and no primary policy or other insurance applies."