WILLIAM J. VICKODIL, SR., & another[1] *vs.* LEXINGTON
INSURANCE COMPANY.

Suffolk. September 9, 1991. - March 9, 1992.

Present: LIACOS, C.J., NOLAN, O'CONNOR, & GREANEY, JJ.

*Insurance*, Liability insurance, Motor vehicle insurance, Construction of
policy, Insolvency of insurer. *Contract*, Insurance. *Practice, Civil*, Summary judgment.

Where no language in a policy of a second-level excess insurer had the
effect of rendering ambiguous otherwise clear policy language, the fact
that the first-level excess insurer had become insolvent did not require
that the second-level policy "drop down" to furnish coverage. [134-136]
This court declined to follow the holding of *Northeastern Tennis Club,
Inc.* v. *Northeastern Fire Ins. Co.*, 26 Mass. App. Ct. 329 (1988), with
respect to second-level excess insurance coverage "dropping down" to
an amount below the level specified in the policy, on account of the
first-level excess insurer's insolvency. [136-138]

CIVIL ACTION commenced in the Superior Court Department on September 5, 1989.

The case was heard by *Guy Volterra*, J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Gary D. Buseck* (*Harry A. Pierce & William A. Cotter, Jr.*, with him) for the defendant.

*Herbert D. Lewis* for the plaintiffs.

O'CONNOR, J. The plaintiff William J. Vickodil sustained serious personal injuries and his wife, the plaintiff Jean R. Vickodil, sustained related losses as a result of a collision in Pennsylvania between a vehicle operated by William and a vehicle owned by Amram Enterprises, Ltd. (Amram), and

---

[1]Jean R. Vickodil.

operated by its employee. The plaintiffs obtained judgments against Amram and its employee totalling $1,473,934.10. At the time of the accident, Amram had motor vehicle liability insurance with three insurance companies. Aetna Life and Casualty Insurance Company (Aetna) provided primary coverage up to $100,000 per person. Northeastern Fire Insurance Company of Pennsylvania (Northeastern) provided coverage in excess of the primary limits to a maximum of $1,000,000. The defendant Lexington Insurance Company (Lexington) was a second-level excess insurer, insuring Amram and its employee above the combined coverage of Aetna and Northeastern up to $5,000,000.

After the plaintiffs obtained the judgments in the tort case, Aetna paid them its $100,000 coverage. However, Northeastern became insolvent and made no payment. As a result, the Pennsylvania Insurance Guaranty Association Fund, which under Pennsylvania law had responsibility for paying claims against insolvent insurers, including Northeastern, up to a prescribed limit, paid the plaintiffs $299,900. Lexington paid the plaintiffs $473,394.10, which was the amount of the judgments in excess of $1,000,000. Thus, the plaintiffs have received $873,834.10, which is $600,100 less than their total tort judgments. By this action, they seek a judgment declaring that the lower limit of Lexington's coverage "dropped down" from coverage for loss in excess of $1,000,000 to coverage for loss in excess of the $399,900 underlying coverage that has already been paid.

Lexington moved to dismiss the complaint under Mass. R. Civ. P. 12 (b), 365 Mass. 754 (1974), "for reasons which more particularly appear in the memorandum of law submitted [with the motion]." Since the memorandum was not reproduced in the record appendix, the record before us does not disclose the grounds of the motion. A judge in the Superior Court denied the motion to dismiss without any written explanation disclosed by the record. Shortly after Lexington filed its motion to dismiss, the plaintiffs filed a motion for summary judgment and the same judge allowed it. He reasoned as follows: "There exists ambiguity in Lexington's ex-

cess policy which requires that it 'drop down' to replace the insolvent [Northeastern's] coverage. The Lexington policy fails to specifically and directly address the consequences of the insolvency of an underlying insurer. Any ambiguity should be resolved in favor of the insured and coverage should be provided. Therefore, due to the insolvency of the first-level excess insurer, defendant Lexington Insurance Company's second-level excess policy 'drops down' to furnish coverage for the unpaid amount of the insured liability." The judge did not identify any policy language creating an ambiguity. It may be that, in his view, the policy's failure to "specifically and directly address the consequences of the insolvency of an underlying insurer" itself created the ambiguity to which he referred.

In their briefs, the parties have devoted considerable attention to issues of jurisdiction, choice of law, and the timeliness of this action. It is likely that those issues were raised by Lexington's motion to dismiss. We agree with the plaintiffs that the Superior Court had personal jurisdiction over Lexington, which is a Delaware corporation with a principal place of business in this Commonwealth, and that it had subject matter jurisdiction pursuant to G. L. c. 231A, § 1 (1990 ed.). Also, we assume without deciding that Massachusetts law controls the resolution of this case, as the plaintiffs contend, and that the action is not time barred. We make these assumptions which favor the plaintiffs because we conclude that, in any event, under Massachusetts law Lexington's coverage does not drop down to fill the void created by Northeastern's insolvency. Therefore, Lexington, rather than the plaintiffs, is entitled to summary judgment.

Section I of the policy, entitled "Insuring Agreements," provides: "The Lexington Insurance Company . . . hereby agrees, to indemnify the insured . . . against loss which is excess of the total limit(s) of all Underlying Insurance specified in Section II (b) of the Declarations subject to the limit of liability stated in Section 1 (c) of the Declarations. . . . Liability of the Company under this policy shall not attach unless and until the Insured or the Insured's Underlying In-

surance has paid or has been held liable to pay the total applicable underlying limits." Section II (b) of the Declarations says under the heading "Underlying Insurance": "Total limits of all underlying insurance including the underlying policy in excess of which this policy applies: $1,000,000. Combined Single Limit Bodily Injury and Property Damage Liability."

Except when specific policy language is required by law, *Bilodeau* v. *Lumbermens Mut. Casualty Co.*, 392 Mass. 537, 541 (1984), ambiguities in policies are resolved against the insurer. *Pinheiro* v. *Medical Malpractice Joint Underwriting Ass'n of Mass.*, 406 Mass. 288, 294 (1989). *Massachusetts Insurers Insolvency Fund* v. *Continental Casualty Co.*, 399 Mass. 598, 600 (1987). The plaintiffs do not argue, properly we think, that the policy's failure specifically to address the consequences of the insolvency of an underlying insurer by itself creates ambiguity. The plaintiffs argue that the policy language quoted above, which is not required by law, is ambiguous in that "a reasonable insured might understand the phrase 'total limit(s)' to refer to the amount actually available under the policy referred to in Section II (b) of the declarations." The plaintiffs say that it would be "reasonable for an insured who was unfamiliar with insurance parlance to conclude that Lexington's obligation to cover losses 'excess of the total limit(s) of all Underlying Insurance specified in Section II (b) of the Declarations' required it to drop down inasmuch as the 'total limit' of the underlying coverage was reduced to zero when Northeastern became insolvent." In support of that assertion, the plaintiffs point to language in this court's opinion in *Massachusetts Insurers Insolvency Fund* v. *Continental Casualty Co.*, *supra.*

We reject the plaintiffs' argument. Standing alone, the language the plaintiffs characterize as ambiguous cannot reasonably be construed to provide coverage in excess of "collectible" insurance as the plaintiffs contend. The language clearly defines Lexington's commitment to be that it will pay excess of the commitments made by applicable underlying insurers as set forth in Section II (b) of the Declarations,

namely $1,000,000. There is a critical difference between this case and *Massachusetts Insurers Insolvency Fund, supra,* on which the plaintiffs rely. The excess policy in that case contained a provision similar to the provision under discussion in this case, *id.* at 599, but it also contained another provision which is not present here. The other provision was that, if the underlying limit of liability has been "reduced," the policy becomes excess of the reduced limit. *Id.* at 600. The policy was silent about how the underlying limits might be "reduced" so as to lower the bottom limit of the excess coverage. Specifically, the policy did not say whether an underlying insurer's insolvency would represent a "reduction." The court explained: "Continental argues that the reduction of the limit of the underlying coverage must refer only to a reduction due to payment of a loss or losses. Its excess policy required the insured to maintain the policies listed in the schedule of underlying insurance (or other policies no more restrictive) during the pendency of the policy 'except for any reduction of the aggregate limits of liability in the underlying insurance because of injury or destruction.' In this policy language the cause of the reduction in the aggregate limits of liability is stated, namely, losses paid by the appropriate primary insurance. On the other hand, as noted above, when stating that the excess policy drops down to become excess of any reduced limit of liability, the policy does not restrict or define the causes of the reduction. The difference in the language concerning reduction of coverage is fatal to Continental's argument." *Id.* at 601. In the present case, there is no comparable policy language that has the effect of rendering otherwise clear language ambiguous.

The plaintiffs make a second argument asserting policy ambiguity. Relying on *Northmeadow Tennis Club, Inc. v. Northeastern Fire Ins. Co.,* 26 Mass. App. Ct. 329 (1988), they say that the provision that Lexington's liability under its policy "shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the total applicable underlying limits" might lead a reasonable insured to conclude that Lexington's coverage

would drop down to pay sums for which underlying insurers are liable but do not pay due to insolvency.

In *Northmeadow Tennis Club, Inc.*, *supra*, the plaintiff was insured under three liability policies, a primary policy, an excess policy issued by the defendant Jefferson Insurance Company of New York (Jefferson), and a second-level excess policy issued by another insurer. The primary insurer became insolvent during the pendency of a tort action against Northmeadow Tennis Club, Inc. (Northmeadow). The issue in the case before the Appeals Court was whether the excess insurance should drop down to fill the void created by the primary insurer's insolvency. The Jefferson policy provided that Jefferson's liability would attach only after the primary insurers "have paid or have been held liable to pay the full amount of their respective ultimate net loss." *Id.* at 332. The Appeals Court reasoned that the phrase "held liable to pay," "posits an eventuality in which the insured, and hence the primary insurer, are liable but the insurer for some reason has not paid. The case of insolvency would be such an eventuality. At least the policy is susceptible of that interpretation." *Id.* at 332-333. The Appeals Court concluded that "Jefferson is liable to the limits of its policy, *beginning with the first dollar of the Tennis Club's liability, if any*" (emphasis added). *Id.* at 333.

Following the lead of the Appeals Court, we accept the idea that the provision in Lexington's policy that Lexington's liability "shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the total applicable underlying limits" says that Lexington's liability attached after the insured (Amram and its employee) were held liable to pay the plaintiffs. We also accept the notion that the policy language "posits an eventuality" in which a first-level excess insurer, here Northeastern, is liable but for some reason, including insolvency, has not paid. In those circumstances, Lexington is liable under its policy, a matter which Lexington acknowledged when it paid the plaintiffs $473,394.10. It does not follow, however, that Lexington's coverage *drops down* to be excess of an amount

less than $1,000,000. The provision on which the plaintiffs rely speaks only to the insurer's liability to pay excess. It says nothing about the excess coverage lower limit dropping down below the specified $1,000,000. Therefore, there is no basis to hold that it drops down. We hold that it does not drop down. We do not follow the Appeals Court's contrary holding in *Northmeadow Tennis Club, Inc., supra.*

We mention briefly one other argument made by the plaintiffs. Referring again to the provision that Lexington's liability "shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the *total applicable underlying limits*" (emphasis added), the plaintiffs assert that the word "applicable" reasonably could be construed as meaning "collectible" or "recoverable" because otherwise "total applicable underlying limits" means nothing more than "total underlying limits." This, the plaintiffs say, "would be directly contrary to the well-established rule that an insurance policy should be construed to give meaning to every word and provision therein." It is true that every word in a policy should be given meaning if that is reasonably possible. However, it is not necessary to construe "applicable" as meaning "collectible" or "recoverable" in order to accomplish that result in this case. The word "applicable" in the phrase "total applicable underlying limits" distinguishes the limits of liability stated in the underlying policy or policies covering the loss from limits of liability that might be contained in irrelevant underlying policies. See *Gulezian* v. *Lincoln Ins. Co.,* 399 Mass. 606, 609 (1987).

We reverse the summary judgment for the plaintiffs. We remand this case to the Superior Court for the entry of a judgment declaring that Lexington's coverage does not drop down to fill the void created by Northeastern's insolvency. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974) ("Summary judgment, when appropriate, may be rendered against the moving party").

*So ordered.*