**AETNA CASUALTY & SURETY COMPANY**

v.

**A.L.J.A., INC. d/b/a Art Johnson Motor Car Company, Et Al.**

Civ. A. No. 93–30054–MAP.

United States District Court, D. Massachusetts.

Nov. 3, 1995.

Hilary M. Henkind, Morrison, Mahoney & Miller, Boston, MA, and Laurie J. Condos, Stephen J. Andrick and Ralph C. Sullivan, Morrison, Mahoney & Miller, Boston, MA, for Aetna Casualty & Surety Company.

David M. Mongue, Donovan & O'Connor, Adams, MA, for A.L.J.A., Inc. and Arthur C. Johnson, III.

Richard A. Simons, Reder & Simons, Pittsfield, MA, for Michael Stewart.

Thomas L. Campoli, Campoli & Campoli, Pittsfield, MA, for Joseph Slonski, Barbara Brunell, and Teresa Bragdon.

Thomas M. Herlihy, Herlihy & O'Brien, Boston, MA, for Teresa Bragdon.

Douglas L. Fox, Shumway, Giguere, Byrne & Fox, Worcester, MA, for Metropolitan Property and Casualty Insurance Company.

P. Keyburn Hollister, Gobel & Hollister, Pittsfield, MA, for Cecile Roosa.

### MEMORANDUM REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT

(Docket Nos. 34, 38)

PONSOR, District Judge.

## I. INTRODUCTION

Before the court are defendants'[1] objections to U.S. Magistrate Judge Charles B. Swartwood III's Report and Recommendation of June 15, 1995, which recommends that this court allow plaintiff's Motion for Summary Judgment. For the reasons set forth below, this court will not adopt the magistrate judge's recommendation, and will allow defendants' Motion for Summary Judgment and deny plaintiff's Motion for Summary Judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are not in dispute. On or about November 6, 1991, defendant A.L.J.A., Inc. d/b/a Art Johnson Motor Car Company ("A.L.J.A."), purchased a 1984 Plymouth Voyager ("Voyager") from Caffrey Ford, another car dealer. At the time of the purchase, A.L.J.A. did not receive a certificate of title to the Voyager.

After the sale, A.L.J.A. moved the Voyager to its lot for sale. On or about November 13, 1991, Leon Goguen tentatively agreed to buy the Voyager and tendered the full sale price. A.L.J.A. agreed to provide Goguen with the certificate of title. Goguen left the vehicle with A.L.J.A. for minor repair work.

On or about November 14, 1991, Arthur C. Johnson III, president of A.L.J.A., called Caffrey Ford to ask for the certificate of title. A sales manager told Johnson that the Voyager's original owner had lost the original certificate of title, but that Caffrey Ford had applied for a duplicate and expected to receive it within seven to ten days.

On or about November 19, 1991, Goguen came to A.L.J.A.'s premises. At that time, A.L.J.A. and Goguen signed an "Agreement and Bill of Sale" as well as an "Odometer Disclosure Statement." The deal was not completely consummated, however, because as of November 19 A.L.J.A. still had not received the certificate of title. Nevertheless, A.L.J.A. allowed Goguen to use the vehicle.

At the time Goguen took possession, Johnson informed Goguen that he could attach the license plates of another vehicle Goguen owned onto the Voyager while he used it. During the week following November 19, Goguen occasionally dropped by A.L.J.A. to see if the certificate of title had arrived. On one occasion, A.L.J.A. offered to suspend the transaction, return the purchase price and take the vehicle back from Goguen, but Goguen declined.

At some point between December 1, 1991, and December 13, 1991, the police stopped Goguen while he was driving the Voyager and told him that he could not put the plates from another vehicle onto the Voyager. After this incident, Goguen told A.L.J.A. that he was not going to purchase the Voyager if A.L.J.A. could not provide him with the certificate of title. A.L.J.A. then attached one of its own dealer plates to the vehicle to permit Goguen to continue driving it. On

1. For purposes of this memorandum, the term "defendants" refers to Joseph Slonski, Administrator of the Estate of Melinda Slonski, Joseph Slonski and Barbara Brunell, Co–Administrators of the Estate of Joshua Brunell, and Barbara Brunell, Administratrix of the Estate of Richard Brunell.

December 11, 1991, Goguen spoke with an A.L.J.A. employee, stressing that he wanted the certificate of title prior to December 13, when his friend, Suzanne Stewart, would be driving the Voyager to Vermont. Nevertheless, the certificate was still not procured.

On December 15, 1991, Stewart lost control of the Voyager while driving it in Vermont and struck another vehicle. Several people travelling in the vehicle died, and others sustained various injuries. On the date of the accident, A.L.J.A.'s dealer plate was still attached to the Voyager. Johnson told the state trooper investigating the accident that he knew Stewart would be taking the Voyager to Vermont.

At the time of the accident, A.L.J.A. was insured under a garage liability policy issued by plaintiff Aetna Casualty & Surety Company. Defendants seek coverage under the Aetna policy on the grounds that Stewart was insured as a permissive user of a vehicle owned by A.L.J.A. or, alternatively, one used in connection with A.L.J.A.'s garage operations. Plaintiff contends that Stewart was not a permissive user because the Voyager was not owned by A.L.J.A. at the time of the accident. Plaintiff also argues that the Voyager was not used in connection with A.L.J.A.'s garage operations. Lastly, plaintiff asserts that Stewart did not qualify as an insured at the time of the accident. Plaintiff filed this action seeking a declaration that its garage liability policy provides no coverage to A.L.J.A., Arthur C. Johnson III, or the Estate of Suzanne Stewart in connection with the December 15, 1991 accident. Both sides have filed cross-motions for summary judgment.

### III. *SUMMARY JUDGMENT STANDARD*

The court may allow a motion for summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[W]here the facts upon which liability is claimed or denied under an insurance policy are undisputed and the existence or amount of liability depends solely upon a construction of the policy, the question presented is one of law for the court to decide." *Continental Cas. v. Canadian Universal Ins.*, 924 F.2d 370, 374 (1st Cir.1991) (citation omitted).

### IV. *DISCUSSION*

Neither side disputes the magistrate judge's decision to apply Massachusetts law, and the facts indicate that Massachusetts law should apply in this case.

Under Massachusetts law, interpretation of the provisions of an insurance policy is a matter of law. *Allstate Ins. Co. v. Bearce*, 412 Mass. 442, 446–47, 589 N.E.2d 1235 (1992). The court must construe an insurance policy according to the fair and reasonable meaning of its terms. *Cody v. Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146, 439 N.E.2d 234 (1982). Ambiguous terms and exclusionary clauses must be construed in favor of coverage. *Vickodil v. Lexington Ins. Co.*, 412 Mass. 132, 135, 587 N.E.2d 777 (1992); *Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass.App.Ct. 318, 324, 568 N.E.2d 631 (1991).

Defendants do not dispute the magistrate judge's decision with respect to Part I of the policy, and the court finds no reason to deviate from the magistrate judge's recommendation in this respect. Therefore, the court concludes that Part I of the policy offers no coverage to defendants in connection with the December 15, 1991 accident.

Coverages B and C of Part II provide that plaintiff will defend and indemnify an "insured" for all bodily injury and property damage arising out of a "Motor Vehicle Hazard." The policy defines "Motor Vehicle Hazard" as:

(a) The ownership, maintenance or use of any motor vehicle for the purpose of garage operations, (b) the occasional use for other business purposes and the use for non-business purposes of any motor vehicle owned by or in charge of the Named Insured and used principally in garage operations, and (c) the ownership, maintenance or use of any motor vehicle owned by the Named Insured while furnished for the use of any person.

The policy goes on to define "garage operations" as "[t]he ownership, maintenance or

use of the premises for the purposes of a garage, and all operations necessary or incidental thereto...."

Under Part II of the policy, an "insured" includes:

(1) The Named Insured [and]

(2) With respect to the Motor Vehicle Hazard, under Coverages B and C:

(a) any person while using, with the permission of the Named Insured, a motor vehicle to which the insurance applies under sections (a) and (b) of the Motor Vehicle Hazard, provided such person's actual operation or (if he is not operating) his actual use thereof is within the scope of such permission.

(b) any person while using a motor vehicle to which the insurance applies under section (c) of the Motor Vehicle Hazard with the permission of the person or organization to whom such motor vehicle is furnished, provided such person's actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission[.]

Excluded from the definition of "insured" is "any person ... with respect to any motor vehicle ... possession of which has been transferred to another by the Named Insured pursuant to an agreement of sale."

The court must first determine whether the damages sustained in the December 15, 1991 accident arose out of a "Motor Vehicle Hazard." The court's discussion will focus on sections (a), (b), and (c)—the so-called "garage operations" and "furnished for use" provisions—of the definition of "Motor Vehicle Hazard." If the damages arose out of a "Motor Vehicle Hazard," the court must then decide whether Stewart qualifies as an "insured" for purposes of coverage.

### A. *The "Furnished For Use" Provision*

The court's discussion begins with the "furnished for use" provision. Section (c) of "Motor Vehicle Hazard" provides coverage to an "insured" for damages arising out of "the ownership, maintenance or use" of any vehicle owned by A.L.J.A. "while furnished for the use of any person." Coverage under the "furnished for use" provision thus raises two

issues: (1) who owned the Voyager at the time of the accident, and (2) if A.L.J.A. owned the Voyager, was it furnished for Stewart's use.

### 1. *The Ownership Issue*

Resolution of the ownership issue turns on an analysis of the two statutory schemes governing automobile sales, specifically Article 2 of the Uniform Commercial Code ("Article 2"), Mass.Gen.L. ch. 106, §§ 2–101 through 2–725, and the Uniform Motor Vehicle Certificate of Title and Anti–Theft Act ("UMVCTA"), Mass.Gen.L. ch. 90D, §§ 1–38.

Article 2 generally diminishes the role of "title" in transactions involving sales of goods. *See* Mass.Gen.L. ch. 106, § 2–401. Under the UMVCTA, however, the certificate of title plays an instrumental role in motor vehicle transfers. *See* Mass.Gen.L. ch. 90D, § 15. Addressing the potential conflict between the UCC and UMVCTA, the Supreme Judicial Court has held that "[i]t is clear that [the UMVCTA] does not supersede or abrogate [the UCC], but only adds additional requirements in certain circumstances." *Dion v. Silver City Dodge, Inc.,* 398 Mass. 58, 61, 495 N.E.2d 274 (1986).

■ The first step in the court's analysis of the issue of ownership is to determine whether these "additional requirements" were met. The court then must determine whether the transactions satisfied the requirements of Article 2.

The ultimate issue is, of course, who owned the Voyager at the time of the accident. The court's inquiry begins with the transfer between Caffrey Ford and A.L.J.A.

a. *The Caffrey Ford—A.L.J.A. Transfer.* Mass.Gen.L. ch. 90D, § 15 provides in relevant part:

(a) If an owner of a vehicle for which a certificate of title has been issued under this chapter transfers his interest therein ..., he shall, at the time of the delivery of the vehicle, execute an assignment including the actual odometer reading and warranty of title to the transferee in the space provided therefor on the certificate ..., and cause the certificate and assignment to

be mailed or delivered to the transferee or to the registrar.

(b) Except as provided in section sixteen, the transferee shall, promptly after delivery to him of the vehicle, execute the application for a new certificate of title in the space provided therefor on the certificate ..., and cause the certificate and application to be mailed or delivered to the registrar.

Section 15(e) concerns the effectiveness of transfers that fail to comply with the provisions of § 15. It reads in relevant part:

Except as provided in section sixteen and as between the parties, a transfer by an owner is not effective until the provisions of this section and section eighteen [concerning application fees] have been complied with....

Section 16, which applies to transfers to or from a dealer, provides in part:

If a dealer buys a vehicle and holds it for resale and procures the certificate of title from the owner or the lienholder after delivery to him of the vehicle, he need not send the certificate to the registrar but, upon transferring the vehicle to another person ..., shall promptly execute the assignment and warranty of title by a dealer ... in the spaces provided therefor on the certificate ... and mail or deliver the certificate to the registrar or transferee with the transferee's application for a new certificate.

■ Because a certificate of title had been issued for the Voyager at the time of the transfer, § 15(a) applies.[2] Caffrey Ford was required to execute the assignment set forth on the certificate of title and transfer it to A.L.J.A. or the registrar. Caffrey Ford failed to do so. Therefore, pursuant to § 15(e), the transfer was invalid unless § 16 applies or the parties agreed otherwise. Here, it is clear that Caffrey Ford and

A.L.J.A. agreed to complete the sale without the certificate of title. A.L.J.A. intended to park the car on its lot and display it for sale. As between the parties, immediate delivery of the certificate of title was unnecessary. A.L.J.A. was content to wait for a duplicate to arrive.

The court may now proceed with an analysis of the transfer under Article 2. Mass. Gen.L. ch. 106, § 2–401(3) reads in relevant part:

Unless otherwise explicitly agreed where delivery is to be made without moving the goods

(a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents....

Under Massachusetts law, § 2–401(3)(a) governs sales of automobiles. *Commonwealth v. Wellesley Toyota Co., Inc.,* 18 Mass.App.Ct. 733, 735 n. 6, 470 N.E.2d 142 (1984); *Fireman's Fund Ins. Co. v. Blais,* 14 Mass.App.Ct. 254, 258–59, 438 N.E.2d 360 (1982). Thus, "[w]here, as with a car, it is necessary to deliver a document of title, the sale is completed at the time when and the place where the seller delivers the title documents." *Wellesley Toyota,* 18 Mass.App.Ct. at 735 n. 6, 470 N.E.2d 142 (citing Mass. Gen.L. ch. 106, § 2–401(3)).

Plaintiff argues that § 2–401(2), which applies to sales that require moving the goods, should govern because the Voyager was physically moved from A.L.J.A.'s lot to Goguen's residence. Plaintiff's argument is without merit. Virtually all goods are moved away from the seller's place of business after sale. The question is not whether the goods will be moved, but who will move them. Section 2–401(3)(a) applies to cases in which the seller is not responsible for delivering the goods to the purchaser's place of business or

**2.** Plaintiff argues that § 15(a) should not apply in this case because the original owner had lost the certificate of title to the Voyager. This argument lacks merit. The restrictive clause "for which a certificate of title has been issued" operates to exclude only those vehicles for which a certificate of title has never been issued. *See, e.g., Dion,* 398 Mass. at 61, 495 N.E.2d 274 (holding that § 15(a) does not apply to new vehicle that

has not been registered). Any other interpretation would defeat the purposes of establishing a comprehensive certificate of title registry. To this end, the UMVCTA allows for the issuance of a duplicate in the event of a lost certificate of title. *See* Mass.Gen.L. ch. 90D, § 14. Accordingly, the court concludes § 15(a) does apply to vehicles for which a certificate of title has been issued and subsequently lost.

residence. Here, Goguen picked up the Voyager from A.L.J.A.'s lot and drove it away. Section 2–401(3)(a) clearly applies.

■ Caffrey Ford and A.L.J.A. did not exchange the certificate of title at the time of sale. Pursuant to § 2–401(3)(a), however, the parties did reach an "explicit agreement" regarding the terms of the sale. Specifically, A.L.J.A. agreed to purchase the car on Caffrey Ford's promise to apply for a duplicate certificate of title. Although the parties did not reduce this agreement to writing, there is no evidence that Caffrey Ford or A.L.J.A. objected to its terms. Under these circumstances, where two merchants agree to postpone delivery of a title document, the parties must be deemed to have reached an agreement satisfying § 2–401(3). *See also* Mass. Gen.L. ch. 90D, § 16 (providing for procurement of certificate of title after delivery to dealer of vehicle). Title passed, and A.L.J.A. assumed ownership of the Voyager.

■ b. *The A.L.J.A—Goguen Transfer.* Section 15(a) of the UMVCTA also applies to the A.L.J.A.–Goguen transfer because a certificate of title had been issued for the Voyager. Unlike the Caffrey Ford–A.L.J.A. transfer, however, neither exception set forth in § 15(e) applies. The court will address these exceptions in turn.

As noted above, § 16 provides that dealers who buy vehicles and hold them for resale need not send the certificate of title to the registrar until the vehicle has been transferred to another person. A.L.J.A. failed to satisfy this provision because it did not "promptly execute" the assignment and warranty on the certificate upon transfer of the Voyager to Goguen. Indeed, Goguen had possession of the vehicle for nearly one month before the accident, during which time A.L.J.A. failed to procure the certificate of title. Therefore, this exception does not apply.

The "as between the parties" clause of § 15(e) is the only arguably applicable exception, but the facts do not support an agreement between the parties in this case. To be sure, there is evidence that the parties attempted to complete a sales transaction, including the execution of an "Agreement and Bill of Sale," full payment, and provisional transfer of physical possession of the vehicle to Goguen. A.L.J.A.'s failure to make good on its promise to deliver the certificate of title, however, vitiates these indicia of ownership. A certificate of title not only evidences legal ownership, but also enables the buyer to register and insure the vehicle in his name. In practical terms, it is hard to imagine that Goguen owned the vehicle when, after almost one month of possession, he still could not register it in his name. Moreover, A.L.J.A. was still offering to return the purchase price, and Goguen was complaining about A.L.J.A.'s failure to complete the transaction. The sale was in limbo.

Even if the court could make out a transfer "as between the parties," § 2–401(3)'s requirement of an "explicit agreement" would surely negate any argument that Goguen owned the vehicle. On these facts, the entire transaction had a "seat of the pants" quality to it. Goguen insisted on getting the certificate of title, but A.L.J.A. never really knew when it would arrive. Eager to drive the vehicle, Goguen attached the plates of another car he owned onto the Voyager and periodically checked with A.L.J.A. about the certificate. Johnson suspected trouble, even offered to return Goguen's money, and eventually put an A.L.J.A. dealer plate on the Voyager. Still, Goguen threatened to call off the purchase. In short, there is insufficient evidence to anchor the requisite meeting of the minds for an "explicit agreement" about the terms of sale. As such, the court finds no genuine dispute that title did not pass and that A.L.J.A. retained ownership of the Voyager.

### 2. *The Furnished-for-Use Issue*

■ The second issue is whether the Voyager was furnished for Stewart's use. Given Johnson's knowledge of Goguen's intention to let Stewart drive the Voyager to Vermont, A.L.J.A. impliedly gave Stewart permission to use the vehicle. A.L.J.A., as the owner, thus furnished the vehicle for Stewart's use.

Therefore, the court concludes that section (c) of "Motor Vehicle Hazard" under Coverages B and C of Part II of the policy applies to the December 15, 1991 accident.

B. *The "Garage Operations" Provisions*

■ Sections (a) and (b) of "Motor Vehicle Hazard" provide alternative coverage to an "insured" for damages arising out of the use of a vehicle (1) "for purposes of garage operations," or (2) "for other business purposes" or "for non-business purposes" and "used principally in garage operations." In light of the ambiguity of the term "garage," the court must view the term in the light most favorable to coverage. *See Vickodil,* 412 Mass. at 135, 587 N.E.2d 777. Thus, references to "garage operations" include the A.L.J.A. dealership and "all operations necessary or incidental thereto."

■ With respect to coverage under the "garage operations" provisions, the question is whether Stewart used the Voyager for purposes of the ownership, maintenance, or use of the A.L.J.A. automobile dealership, or any operations "necessary or incidental thereto."

The phrase "necessary or incidental" is open to divers interpretations. The term "necessary" by itself "may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought." *Avemco Ins. Co. v. Aerotech, Ltd.,* 677 F.Supp. 35, 43 (D.Mass.1987) (citation omitted). Moreover, there is no way to measure precisely the scope of the "seemingly lesser inclusive term 'incidental.'" *See id.* at 43, n. 13.

■ In light of the strong policy in favor of coverage, *see Camp Dresser & McKee,* 30 Mass.App.Ct. at 323–24, 568 N.E.2d 631, the court concludes that Stewart's use of the Voyager falls within the boundaries of the policy's "garage operations" provisions. By lending its dealer plate to Goguen, A.L.J.A. took a calculated risk to rescue what might best be described as a disrupted and failing sale. Attaching the dealer plate to the vehicle was at the very least "convenient" and "conducive to the end sought." *See also Hartford Insurance Group v. Rubinshteyn,* 66 N.Y.2d 732, 497 N.Y.S.2d 352, 488 N.E.2d 98 (1985) (permitting buyer to use dealer plates immediately following sale is an arrangement that benefits both buyer and dealer and constitutes an act "necessary or incidental" to dealer's business). A.L.J.A. thus permitted Goguen to use the Voyager for purposes of salvaging its goodwill and, it hoped, eventually completing the deal. The court thus concludes that Goguen's and Stewart's use of the vehicle falls squarely within the meaning of section (a) of "Motor Vehicle Hazard."[3] Accordingly, section (a) of "Motor Vehicle Hazard" under Coverages B and C of Part II of the policy provides alternative coverage for the accident.[4]

C. *Stewart As an "Insured"*

■ The final issue concerns whether Stewart qualifies as an "insured" under Cov-

3. Therefore, the court need not determine whether section (b), which covers use "for other business purposes" or "non-business purposes" of any vehicle owned by or in charge of A.L.J.A. and "used principally in garage operations," applies here. Suffice it to say that by its terms section (b) seems to provide coverage for whatever business-related use of a garage vehicle section (a) fails to reach. If the court determined that section (a) did not extend to Stewart's use in this case, which it has not, the court would likely find that section (b) sufficiently broadens the scope of use to afford coverage.

4. Plaintiff makes an additional argument. Massachusetts law does not allow a vehicle to be driven with dealer plates for more than five successive days. Mass.Gen.L. ch. 90, § 5(c). Plaintiff contends that Goguen's use of the vehicle ceased to be "necessary or incidental" to "garage operations" once the five-day limit expired.

This argument is unpersuasive for two reasons. First, plaintiff has adduced no evidence that the dealer plate was on the Voyager for more than five successive days at the time of the accident. Rather, the facts indicate that A.L.J.A. put its dealer plate on the Voyager at some time between December 1, 1991 and December 13, 1991.

Second, the court is uneasy with the potential reach of plaintiff's argument. If coverage were denied to every motor vehicle operating in violation of a statute, plaintiff's policy would probably offer little coverage at all. In any event, with respect to this case, the court will not read an exclusion on the use of dealer plates into the phrase "necessary or incidental," an interpretation that would otherwise frustrate the legislature's broader aim of limiting the use of public ways to registered and insured motor vehicles. *See generally id.* at §§ 1A, 2, 34A.

erages B and C of Part II of the policy. As the court noted above, an "insured" includes "any person while using, with the permission of the Named Insured, a motor vehicle to which the insurance applies under sections (a) and (b) of the Motor Vehicle Hazard" and "any person while using a motor vehicle to which the insurance applies under section (c) of the Motor Vehicle Hazard with the permission of the person or organization to whom such motor vehicle is furnished" provided that such use is within the scope of the permission. An "insured" does not include "any person or organization other than the Named Insured with respect to any motor vehicle ... possession of which has been transferred to another by the Named Insured pursuant to an agreement of sale."

Plaintiff claims that possession of the Voyager was transferred by A.L.J.A. to Goguen pursuant to an agreement of sale, and therefore Stewart was not an "insured" as defined in the policy. Defendants argue that the meaning of the term "transfer" in the exclusionary clause is ambiguous, and therefore must be construed in favor of coverage.

The crux of the issue lies somewhere between plaintiff's and defendants' arguments. Generally, of course, the court must strictly construe exclusionary clauses in insurance contracts in favor of coverage. *See Camp Dresser & McKee*, 30 Mass.App.Ct. at 324, 568 N.E.2d 631. In the context of this exclusionary clause, however, there can be little uncertainty about the meaning of the term "transfer." The exclusion refers to a transfer of possession, not ownership, and the court cannot suspend the fair and reasonable meaning of these terms. *See Cody*, 387 Mass. at 146, 439 N.E.2d 234. There can be no dispute that possession of the Voyager was physically transferred from A.L.J.A. to Goguen.

It is equally clear, however, that the parties did not make the physical transfer "pursuant to an agreement of sale." As the court explained above, the undisputed facts can only lead to the conclusion that there was no final agreement of sale in this case. Goguen certainly had no intention of buying the vehicle unless A.L.J.A. could furnish the certificate of title. Sometime in early to middle December, Goguen's frustration peaked, and A.L.J.A. attached its dealer plate to the vehicle in an effort to buy time to finalize the potential agreement. A.L.J.A. did not know when the certificate of title would arrive, or whether it would arrive at all. Nevertheless, it placed no limitations on Goguen's use of the dealer plate. Given these facts, the court can only conclude that the parties intended the plate to remain on the Voyager provisionally, until such time as the parties could negotiate a proper agreement.

Plaintiff is of course correct that the physical transfer of the car took place because, at least for most of the relevant period, both parties *expected* a sale eventually to occur. But this is not enough. At the time A.L.J.A. attached its dealer plate to the vehicle, the parties had no agreement of sale. Goguen could have returned the vehicle and received his money back without breaching any agreement with A.L.J.A., because no agreement existed. Under the strict construction of the exclusion, Goguen did not obtain physical possession pursuant to an "agreement of sale."

Goguen was therefore an "insured" under the terms of the policy. Because Stewart's use of the Voyager was known to and permitted by Goguen and A.L.J.A., and because her use was within the scope of that permission, Stewart therefore also qualifies as an "insured" under Part II of the policy.

## V. *CONCLUSION*

Since Stewart was an "insured" as defined by the policy at the time of this tragic accident, and since the accident was covered under both the "furnished for use" and "garage operations" provisions of the policy, plaintiff Aetna is not, as a matter of law, entitled to the declaratory relief it seeks. The court therefore hereby ALLOWS defendants' for Summary Judgment and DENIES plaintiff's Motion for Summary Judgment. The case will be set down for a status conference with all counsel to discuss whether entry of judgment for defendants is now appropriate.