[No. A066442. First Dist., Div. Three. Sept. 28, 1995.]

WELLS FARGO BANK, N.A., Plaintiff and Appellant, v.
CALIFORNIA INSURANCE GUARANTEE ASSOCIATION et al.,
Defendants and Respondents.

## COUNSEL

Daniel U. Smith, Coogler Law Office, Gil M. Coogler, Feldman, Waldman & Kline, Patricia S. Mar and Malcolm Leader-Picone for Plaintiff and Appellant.

Wolkin & Timpane, Brandt L. Wolkin, Susan M. Hogan and Knecht, Haley, Lawrence & Smith for Defendants and Respondents.

## OPINION

**PARRILLI, J.**—In this case we examine the specific terms of the insurance policies before us to determine whether a third level insurer "drops down" to assume the obligations of a second level insurer when the second level insurer becomes insolvent. We agree with the trial court that the third level policy incorporates an endorsement that unambiguously precludes it from "dropping down" to provide second level coverage upon the underlying insurer's insolvency. Consequently, we affirm the summary judgment entered in favor of the insurer.

### I. FACTS

In 1985, 12 former managers who were fired from Wells Fargo Bank, N.A. (Wells Fargo) in 1984 and 1985, filed suit alleging wrongful termination, defamation and other causes of action.[1] None of Wells Fargo's insurers agreed to defend or indemnify Wells Fargo in this lawsuit. Consequently, Wells Fargo paid its own defense costs and negotiated and obtained settlements with all plaintiffs. Wells Fargo paid approximately $7.2 million to defend and settle the lawsuit.

When the wrongful termination lawsuit was filed, Wells Fargo had three levels of general liability insurance, providing aggregate coverage of $31 million. Truck Insurance Exchange (Truck) provided the first level of comprehensive general liability coverage. The Truck policy had limits of $1 million per occurrence, and a $1 million annual aggregate limit.

---

[1] The parties elected to proceed by way of a joint appendix. (Cal. Rules of Court, rule 5.1.) The applicable rules state that the pages of the appendix "shall be numbered consecutively." (Cal. Rules of Court, rules 9(a), 5.1(c)(1).) The parties have not complied with this rule, but have instead inserted tabs to separate the various documents in the appendix. This system makes our task of reading and citing to the transcript far more cumbersome than it need be. In the future, counsel should closely follow the rules of court on matters of form, or risk more stringent court action under California Rules of Court, rule 18.

Mission National Insurance Company (Mission)—which later became insolvent—provided the next level of coverage, an "Umbrella Liability Insurance" policy. The Mission policy provided $10 million in aggregate coverage for (1) claims the underlying Truck policy covered but which exceeded that policy's $1 million coverage limit (the excess coverage); and (2) claims that the Truck policy did not cover, provided that Wells Fargo paid a $10,000 deductible for such claims (the umbrella coverage).[2] Specifically, the pertinent policy language provided: "The Company (Mission) shall only be liable for the ultimate net loss the excess of either [¶] (a) the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence *covered* by said underlying insurances. [¶] or (b) the amount as set out in item 2(c) of the Declarations [$10,000] in respect of each occurrence *not covered* by said underlying insurances." (Italics added.)

During 1985 respondent Insurance Company of North America (INA) and Granite State Insurance Company (Granite) provided the third level of coverage. Each of the third level policies provided excess coverage of $10 million as a "50% quota share" of total third level excess coverage of $20 million. The INA policy "followed form" with the underlying Mission policy. A "following form" policy incorporates the terms and conditions of another carrier's policy and provides the same scope of coverage as the underlying policy. (See *Coca Cola Bottling Co.* v. *Columbia Casualty Ins. Co.* (1992) 11 Cal.App.4th 1176, 1182-1183 [14 Cal.Rptr.2d 643].) Thus, the INA policy incorporated the terms and conditions of the underlying Mission policy.[3] Consequently, we refer to INA's third level coverage as the INA/Mission policy.

After Wells Fargo reached settlement with the wrongful termination plaintiffs, Truck, its primary insurer, agreed to contribute more than $800,000 to that settlement. Wells Fargo paid the rest of the settlement, without contribution from its other insurers.

Wells Fargo then filed a declaratory relief action against INA and the other excess insurers seeking a judicial declaration that each insurer had

---

[2] For the purpose of this opinion, we use the terms "excess coverage" or "excess policy" to mean insurance that begins only after a predetermined amount of underlying coverage is exhausted and that does not broaden the underlying coverage. (See *Steve · D. Thompson Trucking* v. *Twin City Fire Ins.* (5th Cir. 1987) 832 F.2d 309, 310.) We use the term "umbrella coverage" or "umbrella policy" to refer to insurance that "fill[s] any gaps in coverage left open by the [underlying insurance]." (See *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 812 [180 Cal.Rptr. 628, 640 P.2d 764].)

[3] The INA policy provided: "The insurance afforded by this certificate shall follow that of the primary insurance" except for certain exceptions not here pertinent. The "primary insurance" was listed on the INA declaration's page as "Mission National Insurance Co. and others listed in the schedule of underlying insurance . . . ."

breached its obligations and that each was required to reimburse Wells Fargo for settlement and defense costs in the wrongful termination lawsuit.

Mission was insolvent by the time Wells Fargo filed its complaint for declaratory relief. Nevertheless, Wells Fargo contended INA was liable for *Mission's* obligations on the ground that the INA coverage "dropped down" to provide second level coverage when Mission became insolvent.

INA moved for summary judgment contending that, as a matter of law, its third level policy did not drop down to provide coverage as a second level policy. INA argued that the INA/Mission policy contained a clause which unambiguously stated it would not drop down in the event of the underlying insurer's insolvency. In particular, INA relied on the following clause (endorsement No. 4): "It is hereby understood and agreed that: [¶] In the event of reduction or exhaustion of the aggregate limits designated in the underlying policy or policies *solely by payment of losses* in respect to accidents or occurrences during the period of such underlying policy or policies, it is hereby understood and agreed that such insurance as is afforded by this policy shall apply in excess of the reduced underlying limit or, if such limit is exhausted, shall apply as underlying insurance, notwith-standing anything to the contrary in the terms and conditions of this policy."[4] (Italics added.)

The trial court granted INA's motion for summary judgment, stating: "Endorsement No. 4 of the Mission policy states that the underlying policy must be exhausted solely by payment of losses and this language is incorporated in the INA following form excess policy. Under *Span, Inc.* v. *Associated International Insurance Co.* (1991) 227 Cal.App.3d 463, . . . the 'exhaustion . . . solely by payment' language does not require INA to indemnify Wells Fargo upon Mission's insolvency. Accordingly, INA has no obligation to indemnify or defend Wells Fargo."

Wells Fargo made a motion for new trial, which the trial court denied. Wells Fargo has appealed from the judgment entered in INA's favor.[5]

---

[4]This clause was actually an endorsement to the Mission (second level) policy. However, because the INA policy followed form to the Mission policy, that clause effectively became a part of the INA policy. (See *Coca Cola Bottling Co.* v. *Columbia Casualty Ins. Co., supra*, 11 Cal.App.4th at p. 1183 [In a following form policy " 'the excess has the same scope of coverage as the primary policy.' " (Italics omitted.)].)

[5]At the time Wells Fargo filed its notice of appeal, the trial court had not entered judgment with respect to the other defendants in the declaratory relief action. Wells Fargo may properly appeal from a judgment that is final as to one party in a multiparty lawsuit. (Eisenberg, Cal.

## II. DISCUSSION

### A. *Standard of Review*

A moving party is entitled to summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2); *Jambazian* v. *Borden* (1994) 25 Cal.App.4th 836, 843-844 [30 Cal.Rptr.2d 768].) On appeal, we determine de novo whether there is a triable issue of material fact and whether the moving party is entitled to summary judgment as a matter of law. (*Jambazian* v. *Borden, supra,* at p. 844; see also *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719]; *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].)

### B. *The Rules of Insurance Contract Interpretation*

In *Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d 800 (*Reserve*), the Supreme Court held that we must look to the excess policy's express language to determine whether an excess insurer is obligated to bear the risk of an underlying insurer's insolvency. To paraphrase the Supreme Court: we must ask whether the wording of the excess policy requires the excess insurer to provide the coverage that the underlying insurer would have assumed had it not become insolvent. (*Id.* at p. 814.)

■ Well-defined rules guide our interpretation of insurance policies: "Insurance policies are contracts and, therefore, are governed in the first instance by the rules of construction applicable to contracts. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) . . . If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will

Practice Guide: Civil Appeals and Writs (The Rutter Group 1994) ¶ 2:91, p. 2-45.) However, we limit the scope of the issues discussed on appeal to those that involve that one party (INA).

apply that meaning. [Citations.] [¶] In contrast, '[i]f there is ambiguity . . . it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. (Civ. Code, § 1649.)' . . . *'This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer, but, rather, "the objectively reasonable expectations of the insured."* [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. [Citation.]' (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 . . . ; see also *Cooper Companies* v. *Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1101-1102 . . . .)" (*Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666-667 [42 Cal.Rptr.2d 324, 897 P.2d 1], italics added.)

Moreover, " [i]n the insurance context, we generally resolve ambiguities in favor of coverage. [Citations.] Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured. [Citations.] These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. [Citations.] Because the insurer writes the policy, it is held 'responsible' for ambiguous policy language, which is therefore construed in favor of coverage." (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253], fn. omitted, and quoted in *Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 667.)

C.   *Case Law on the "Drop Down" Issue*

*Reserve* is the watershed California case on the "drop down" issue. There, the excess policy contained the following coverage clause: "The Company [CNA] shall only be liable for the ultimate net loss in excess of either:  . . . 1. the amount recoverable under the underlying insurance as set out in the schedule of the underlying insurance; or 2. 20% of the ultimate net loss or $200 ultimate net loss whichever is lesser in respect of each occurrence not covered by said underlying insurance." (30 Cal.3d at p. 812, fns. omitted.) The Supreme Court stated: "The two coverage provisions, when read together, make the CNA policy applicable either as excess insurance over any 'amounts recoverable' under the primary policy or as alternative primary coverage as to losses 'not covered by' the primary policy." (*Ibid.*)

In *Reserve*, as here, the underlying insurer became insolvent. (30 Cal.3d at p. 813.) The Supreme Court concluded that it had to look to the express provisions of the excess policy to determine whether that language required

the excess insurer to step into the shoes of the underlying insurer and to provide first level coverage. (*Id.* at p. 814.) In finding that the excess policy did drop down to provide first level coverage, the Supreme Court reasoned: "CNA assumed liability for any excess over the 'amount recoverable' under the underlying policy. That language might possibly be interpreted either to expose CNA only for amounts over the dollar limits of the underlying insurance or to expose CNA for amounts which the insured is not able to actually recover from the underlying insurer because of its insolvency. Because there are two meanings which may reasonably be attributed to the term in question, it is ambiguous and under settled principles must be construed in favor of the insured. . . . We therefore conclude that the CNA policy includes the risk of Reserve's insolvency within the scope of its coverage . . . ." (*Id.* at pp. 814-815, fn. omitted.) Thus, the *Reserve* court relied on an ambiguity in the excess coverage clause to find coverage. Here, the language of the excess coverage clause is markedly different. The INA excess coverage applies above "the limits of the underlying insurance . . . in respect of each occurrence *covered* by said underlying insurance." It does not apply above "the amount recoverable." Consequently, *Reserve* does not control the present case.

As the trial court noted, *Span, Inc.* v. *Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463 [277 Cal.Rptr. 828] (*Span*) involves policy language which is essentially identical to that in the present case. In *Span*, Associated issued an excess policy which provided: " 'In the event of reduction or exhaustion of the aggregate limits of liability applicable to the underlying insurance . . . *by reason of losses paid thereunder*, this policy shall, . . . (A) in the event of reduction pay the excess of the reduced underlying limit; (B) in the event of exhaustion continue in force as underlying insurance.' " (*Id.* at p. 476, italics in original.) Relying on the reasoning of *Reserve*, the *Span* court concluded that the Associated excess policy "unambiguously contemplates 'exhaustion' of the underlying insurance only by *payment* of the underlying limits either by the insured or its primary carrier. The Associated policy avoids the phrase 'amount recoverable' found to be ambiguous by the *Reserve* court, as well as the unmodified term 'exhausted' which [*Fageol T. & C. Co.* v. *Pacific Indemnity Co.* (1941) 18 Cal.2d 748, 751 (117 P.2d 669)] construed to include exhaustion by insolvency." (*Ibid.*) The *Span* court therefore agreed "with the numerous foreign cases which have concluded [that] the phrase 'exhaustion . . . by reason of losses paid thereunder,' or similar language precludes an obligation of the excess insurer to drop down upon the insolvency of the primary insurer." (*Id.* at pp. 477-478, citing *Mission Nat. Ins. Co.* v. *Duke Transp. Co., Inc.* (5th Cir. 1986) 792 F.2d 550, 553; *Molina* v. *United States Fire Ins. Co.* (4th Cir.

1978) 574 F.2d 1176, 1178; *Highlands Ins. Co.* v. *Gerber Products Co.* (D.Md. 1988) 702 F.Supp. 109, 113; *Guar. Nat. Ins. Co.* v. *Bayside Resort, Inc.* (D.V.I. 1986) 635 F.Supp. 1456, 1459; *U.S. Fire Ins.* v. *Capital Ford Tr. Sales* (1987) 257 Ga. 77 [355 S.E.2d 428, 432]; *Radar* v. *Duke Transp. Inc.* (La.Ct.App. 1986) 492 So.2d 532, 537.)[6]

We cannot meaningfully distinguish the language of endorsement No. 4 to the INA/Mission policy from the language the court considered in *Span.* Endorsement No. 4 provides that "[i]n the event of . . . exhaustion of the aggregate limits designated in the underlying policy or policies *solely by payment of losses* [then this excess insurance] shall apply as underlying insurance. . . ." (Italics added.) If anything, the addition of the word "solely" in the INA/Mission policy strengthens INA's position that its third level coverage does not "drop down" to provide second level coverage upon Mission's insolvency. Every out-of-state court that has interpreted language essentially identical to that in endorsement No. 4 has concluded that it *unambiguously* precludes "dropping down." (*Alabama Ins. Guar. Ass'n* v. *Kinder-Care* (Ala. 1989) 551 So.2d 286, 288-289 ["*solely by reason of losses paid thereunder*" language "cannot be reasonably interpreted to mean that the [excess insurer] was contracting to insure the solvency of the underlying [insurer]"]; *Hendrix* v. *Fireman's Fund Ins. Co.* (Ky.Ct.App. 1991) 823 S.W.2d 937, 939 ["*solely by reason of losses paid thereunder*"]; *Northmeadow Tennis* v. *Northeastern Fire* (1988) 26 Mass.App. 329 [526 N.E.2d 1333, 1336], disapproved on another ground in *Vickodil* v. *Lexington Ins. Co.* (1992) 412 Mass. 132 [587 N.E.2d 777, 779-780] [" 'solely by reason of losses paid thereunder' " language is "unambiguous" "in that it insures against the reduction of the underlying policies only by reason of out-of-pocket payments for losses by lower level insurers"]; *Highlands Ins. Co.* v.

---

[6]The court in *Denny's, Inc.* v. *Chicago Ins. Co.* (1991) 234 Cal.App.3d 1786 [286 Cal.Rptr. 507] (*Denny's*) followed *Span's* analysis. In *Denny's*, Chicago and Comstock jointly provided $20 million in third layer excess coverage. The third level policies provided: " 'It is expressly agreed that liability shall attach to the [excess insurer] only after the Underlying Umbrella Insurer(s) have paid or have been held liable to pay the full amount of the respective ultimate net loss liability as follows: [$10 million each occurrence, but $10 million in the aggregate for each annual period] and the [excess insurer] shall then be liable to pay only the excess thereof up to a further [$10 million part of $20 million combined limit . . .].' " (*Id.* at p. 1790.) As in the present case, the second level umbrella insurer became insolvent and Denny's argued that the third level excess policies should "drop down" to provide second level coverage. (*Id.* at p. 1791.) In rejecting this argument, the *Denny's* court concluded that the third level policies "unequivocally provide that their liability will attach only after the underlying insurer has paid or has been held liable to pay *the full amount* of the underlying coverage, i.e., the policy limit, and that Chicago and Comstock will then be liable to pay '*only the excess*' of the underlying policy limit." (*Id.* at p. 1793, italics in original.) The *Denny's* court concluded that this clause unambiguously precluded a finding that the third level insurers had insured the risk of the second level insurer's insolvency.

*Gerber Products Co.* (D.Md. 1988) 702 F.Supp. 109, 113-114 ["solely by reason of losses paid thereunder"].)

We choose to follow *Span* and the out-of-state cases which have concluded that the "solely by payment of losses" language unambiguously precludes an excess insurer from "dropping down" to provide lower level coverage upon the underlying insurer's insolvency.

Consequently, the trial court correctly granted summary judgment in favor of INA.

### D. *Wells Fargo's Attempt to Distinguish Span*

Wells Fargo recognizes that *Span* construed language which is essentially identical to that in the present case. Nevertheless, Wells Fargo attempts to distinguish *Span* on two grounds.

#### 1) *The Distinction Between Excess Coverage and Umbrella Coverage*

First, Wells Fargo contends that, unlike the policy in *Span*, the INA/Mission policy provides both excess and umbrella coverage (see fn. 2, *ante*). According to Wells Fargo, this difference is critical because, unlike a pure excess policy which " 'provides coverage that begins only after a predetermined amount of primary coverage is exhausted' " (*Span, supra,* 227 Cal.App.3d at p. 474), umbrella coverage "would fill any gaps in coverage left open by the primary coverage in addition to increasing the total possible recovery by the insured." (*Reserve, supra,* 30 Cal.3d at p. 812.) We reject this argument.

The INA/Mission policy provides: "The Company shall only be liable for the ultimate net loss the excess of either [¶] (a) the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence *covered* by said underlying insurances. [¶] or (b) the amount as set out in item 2(c) of the Declarations [$10,000] in respect of each occurrence *not covered* by said underlying insurances." (Italics added.) To paraphrase the *Reserve* court: the two coverage provisions, when read together, make the INA/Mission policy applicable *either* as excess insurance over the limits of the underlying insurance when the underlying insurance "covers" an occurrence, or as alternative primary coverage as to losses "not covered by" the underlying policy. (30 Cal.3d at p. 812.)

Wells Fargo contends that we may distinguish *Span* because the Associated policy in that case provided "excess" coverage only, and did not insure

for "occurrence[s] not covered by" the underlying insurance (i.e., it did not provide umbrella coverage). Wells Fargo argues: "[T]he umbrella coverage of the INA/Mission policy provided 'drop down' coverage, commencing after a $10,000 self insured retention, for any occurrence not covered by underlying insurance. It is that umbrella feature . . . that distinguishes the INA/Mission policy and makes *Span's* narrow analysis of the 'exhaustion . . . by reason of losses paid' language non-controlling." We disagree.

First, Wells Fargo's premise is flawed because we cannot tell from the *Span* opinion whether the Associated policy involved excess or excess *and* umbrella coverage. It is true that the only portion of the insuring agreement that the *Span* court *quoted* concerned excess coverage.[7] However, this was a partial quote only. At no point did the *Span* court indicate that the second level Associated policy was limited to excess coverage. To the contrary, the *Span* court stated that "Associated provided *Span* with an *umbrella policy* of insurance in excess of [the] primary policy." (*Span, supra,* 227 Cal.App.3d at pp. 468-469, italics added.) Thus, the Associated policy could have provided umbrella coverage (as we have defined that term in this opinion), and the *Span* court may have concluded that fact was irrelevant to its analysis.

Even if *Span* involved excess coverage only, that distinction is not critical to our analysis. Wells Fargo claims that *Reserve* controls this case because "the INA/Mission policy follows the same structure as the *Reserve* policy" in that "the policy in *Reserve* provided a combination of umbrella and excess coverage." However, this ignores the fact that the *Reserve* court did not rely on the "umbrella" clause to find drop down coverage. Rather, as we have explained (see *ante,* pp. 943-945) the *Reserve* court found an ambiguity in the "excess" clause and, on that basis alone, found "drop down" coverage. (30 Cal.3d at pp. 814-815.) If anything, *Reserve* is authority for the proposition that umbrella coverage does not automatically result in drop down coverage. Had the Supreme Court thought that the umbrella clause was controlling, it could have based its decision on that clause. Instead, the Supreme Court ignored the umbrella clause and relied solely on the excess clause to find drop down coverage in *Reserve.*

Finally, in making its argument, Wells Fargo ignores the specific wording of the coverage clauses in the INA/Mission policy. That policy provides INA is liable for the amount (a) in excess of the limits of the underlying insurance

---

[7]The quoted provision stated: "[T]he company's liability shall be only for the ultimate net loss in excess of the insured's retained limits defined as the greater of: [¶] (A) an amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance hereof, plus applicable limits of any other underlying insurance collectible by the insured . . . .' " (227 Cal.App.3d at p. 478, italics omitted.)

(the Mission policy) with respect to each occurrence covered by the underlying insurance; *or* (b) in excess of $10,000 with respect to each occurrence not covered by the underlying insurance. Thus, the umbrella clause comes into play only if the occurrence is "not covered" by the Mission policy. As Wells Fargo has persuasively argued, the Mission policy clearly does "cover" the underlying wrongful termination action.[8] It follows that, the excess clause, not the umbrella clause, controls the relationship between INA's third level coverage and Mission's second level coverage.

■ Wells Fargo also argues that the terms "covered" and "not covered" as used in the INA/Mission policy are ambiguous and must be construed against the insurer/drafter (INA). According to Wells Fargo, "[t]here is no significant distinction, from an insured's reasonable reading of the policy, between underlying insurance which is not 'recoverable,' as in *Reserve*, . . . or which does not 'cover' a loss, as [in] the Mission policy. To a lay person, a loss is 'covered' by insurance if the insurance pays for the loss, and is 'not covered' if the insurance does not pay for the loss." Basic rules of contract interpretation expose the flaw in this argument.

We need not repeat in detail the principles of contract interpretation which are set out in part II.B. above, but simply reiterate that under those rules, if a term is reasonably susceptible of only one interpretation it is not ambiguous. In a contract of insurance, if there is an ambiguity regarding coverage, it is resolved by interpreting the ambiguous provision in the sense the insurer believed the insured understood the terms when the insurance contract was formed. The objectively reasonable expectations of the insured guide interpretation of the ambiguous language. If ambiguity still remains, only then is it resolved against the insurer. (*Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 667.)

Here, we conclude the term "covered" is not ambiguous. Webster's Dictionary defines the verb "cover" as "to have sufficient *scope* to include or take into account," and the noun "coverage" to mean "inclusion within *the scope* of an insurance policy or protective plan." (Webster's New Collegiate Dict. (1977) pp. 262-263, italics added.) Thus, a layperson would have understood the phrases "covered by said underlying insurance" and "not covered by said underlying insurance" as referring to the *scope* of the underlying insurance. That is, a layperson would understand that a claim is

---

[8]The Mission policy indemnified Wells Fargo "for damages on account of . . . personal injuries" which include "mental injury," "mental anguish," and "defamation of character." The wrongful termination plaintiffs alleged mental injury and anguish and defamation, which clearly fell within the scope of the Mission coverage.

"covered by underlying insurance" if it falls within the scope of coverage of that insurance, and is "not covered by underlying insurance" if it falls outside the scope of insurance coverage. (See also *Bernard Lumber* v. *Louisiana Ins. Guar.* (La.Ct.App. 1991) 563 So.2d 261, 266 ["While 'recover' refers to the getting back of something lost, 'covered,' as used in this context, refers to being insured against a specified risk or loss. It has nothing to do with 'collectibility,' or the ability to take in payment."].)

If the term "covered" is even arguably ambiguous, the meaning Wells Fargo ascribes to the term is not within " ' "the objectively reasonable expectations of the insured." ' " (*Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 667.) Based on the language in the INA/Mission policy, an insured may not "reasonably expect" that an umbrella insurer will automatically assume the risk of the underlying insurer's insolvency. "[T]he courts that have looked beyond the policy language to other external factors, such as premiums paid and the purpose and nature of excess insurance, have concluded that an insured lacks a reasonable expectation that in the event of his primary insurer's insolvency his excess insurer will provide drop down coverage." (*Louisiana Ins. Guar.* v. *Interstate Fire* (La. 1994) 630 So.2d 759, 768.) The same can be said of umbrella coverage. Generally, an umbrella policy "would fill any gaps in coverage left open by the primary coverage." (*Reserve*, *supra*, 30 Cal.3d at p. 812.) Such coverage is not intended to insure against the underlying insurer's insolvency. Moreover, umbrella policies are sold at more moderate prices than primary coverage because they provide fill-in coverage. Thus, it is not reasonable for the insured to expect that the insurer will accept a risk that was not bargained for as part of the umbrella coverage. (See *Hendrix* v. *Fireman's Fund Ins. Co.*, *supra*, 823 S.W.2d at p. 941.)

In sum, the fact that the INA/Mission policy provided both "umbrella" and "excess" coverage does not make this case distinguishable from *Span*.

2) *The References to "Collectible" Insurance*

■ Wells Fargo next attempts to find "drop down" coverage in the INA/Mission policy by focusing on scattered references to "collectible" insurance in that policy. Wells Fargo claims that these references modify the term "underlying insurance," and require us to read "underlying insurance" to mean "*collectible* underlying insurance" whenever that term appears in the policy. As we explain, the references to "collectible" apply to "other" insurance only, and do not apply to the "underlying" insurance—i.e., the Mission policy.

Wells Fargo points to three clauses in the INA/Mission policy where the word "collectible" appears. First, the word appears in a clause entitled "DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS" which states in pertinent part: "As respects occurrences covered under this policy, but not covered under the *underlying insurances as set out in the attached schedule* or under any other *collectible* insurance, the Company shall" defend the insured in the first instance and reimburse it for all reasonable expenses. (Italics added.) Second, the word appears in a clause entitled "OTHER INSURANCE" which states: "If other *valid and collectible* insurance with any other insurer is available to the insured covering a loss also covered by this policy, other than insurance that is specifically stated to be excess of this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms, conditions and limitations of other insurance." (Italics added.) Finally, the word appears in a clause entitled "ULTIMATE NET LOSS" which reads in pertinent part: ". . . [T]he term 'Ultimate Net Loss' shall mean the total sum which the insured, or his underlying insurers, as scheduled, or both, become obligated to pay by reason of personal injuries [or] property damage . . . and shall also include hospital, medical and funeral charges and all sums paid as [compensation] . . . for doctors, lawyers, nurses and investigators and other persons . . . excluding only the salaries of the insured's or of any underlying insurer's permanent employees. [¶] The Company shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance."

Wells Fargo contends that the use of the word "collectible" in the clauses quoted modifies the term "underlying insurance" so that, whenever the term "underlying insurance" appears in the policy, it should be read to mean "*collectible*" underlying insurance. Consequently, when the INA/Mission policy states that INA shall be liable for "the ultimate net loss the excess of . . . the limits of the underlying insurance[], " Wells Fargo contends we should read this to mean that INA is liable for the excess of the limits of the *collectible* underlying insurance, which would not include the Mission policy because Mission is insolvent. We do not believe this exercise is prudent or necessary.

The Second District rejected a similar argument in *Span*. There, the term "collectible" appeared in two places. First, the word appeared in a clause that limited the excess insurer's liability to the ultimate net loss in excess of " 'an amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance hereof, plus applicable limits of any *other* underlying insurance *collectible by the insured.*

. . .' " (*Span, supra,* 227 Cal.App.3d at p. 478, italics in original.) Second, the word "collectible" appeared in an "Other Insurance" clause essentially identical to the one that appears in the INA/Mission policy (which is quoted above). (*Ibid.*)

The *Span* court distinguished and rejected limited foreign authority and relied on "the majority of cases from other jurisdictions" which addressed similar language and found that the term "collectible" was not ambiguous in this context. (*Span, supra,* 227 Cal.App.3d at p. 480, and cases there cited.) The following statement is indicative of the reasoning of these foreign cases: "[S]ince th[e] excess-insurance policy repeatedly distinguishes between the underlying insurance policy and other insurance, and since it repeatedly states that other insurance must be collectible, but does not so state with respect to the underlying insurance . . . the insolvency of the underlying insurer does not require the excess insurer to [drop down] . . . ." (*U.S. Fire Ins.* v. *Capital Ford Tr. Sales, supra,* 355 S.E.2d at p. 433, and quoted in *Span, supra,* at p. 480.) Relying on this analysis and *Reserve,* the *Span* court concluded that "the language of the policy [before it] unambiguously employs th[e] term ['collectible'] not in connection with the underlying insurance set out in the schedule of underlying insurance . . . but with respect to any *other* underlying insurance collectible by the insured." (*Span, supra,* at p. 480.)

Despite Wells Fargo's effort to draw fine grammatical distinctions between this case and *Span,*[9] we believe the reasoning of *Span* applies with equal force here. In our view, because the INA/Mission policy repeatedly

---

[9]In particular, Wells Fargo contends that the following clause distinguishes this case from *Span:* "As respects occurrences covered under this policy, but not covered under the underlying insurances as set out in the attached schedule or under any other *collectible* insurance . . . ." (Italics added.) Wells Fargo argues that, "[s]ince the adjective 'collectible' qualifies 'any other insurance,' the 'underlying insurances' must also be 'collectible insurance.' The absence of commas, or other syntactical or grammatical clues, which distinguish between the collectibility of the underlying insurances and that of any other insurance, requires one to interpret 'underlying insurances' to mean 'collectible underlying insurances.' "

However, two out-of-state cases have construed *the precise policy language* quoted in this footnote, and both have concluded that, in this provision, "collectible" modifies "other insurance," not "underlying insurances." (*Bernard Lumber* v. *Louisiana Ins. Guar., supra,* 563 So.2d at pp. 264-265; *Radar* v. *Duke Transp. Inc* (La.Ct.App. 1986) 492 So.2d 532, 534-535.) As the *Radar* court noted: "The *other* collectible insurance referred to in this provision is defined later in the policy as meaning 'valid and collectible' insurance with any *other* insurer available to [the insured]. [This same definition appears in the INA/Mission policy.] . . . [¶] . . . [¶] It is important to note that Mission's policy mandates that the other insurance be 'valid and collectible', whereas there is no such requirement placed upon the scheduled underlying insurances . . . . The policy expressly mandates that the *other* insurance be valid and collectible." (*Radar, supra,* at pp. 535-536, italics in original.)

distinguishes between underlying "scheduled" insurance (such as the Mission second level policy)[10] and other "collectible insurance," the policy unambiguously employs the term "collectible" not in connection with the underlying scheduled insurance, but with respect to any other "unscheduled" insurance "collectible" by the insured.

In sum, as it appears in the INA/Mission policy, the term "collectible" does not generally qualify the meaning of "underlying insurance."

### III. DISPOSITION

The judgment is affirmed.

Chin, P. J., and Corrigan, J., concurred.

---

[10]The Mission policy is "scheduled" on the declarations page of INA's third level policy. Since that policy incorporates the terms of the Mission policy, the Mission policy is "scheduled insurance" with respect to INA's third level coverage.