[No. G015394. Fourth Dist., Div. Three. June 25, 1996.]

HOUSING GROUP, Plaintiff and Respondent, v.
CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Defendant
and Appellant.

## COUNSEL

Lewis, D'Amato, Brisbois & Bisgaard and Raul L. Martinez for Defendant and Appellant.

Russell P. Nowell for Plaintiff and Respondent.

## OPINION

**SILLS, P. J.**—The Housing Group is a small housing developer in Orange County. In the period 1983 through 1984 it had a primary comprehensive general liability policy with Central Mutual Insurance Company. The Central Mutual primary policy had no "products" exclusion. During the same period, The Housing Group also had an umbrella policy with Mission National Insurance Company, which listed the Central Mutual policy in its schedule of "underlying" insurance. Mission's umbrella policy *did* have a products exclusion.

The umbrella policy also had a "broad as primary" endorsement which provided: "In the event that the insured suffers a loss which is covered under the policies of underlying insurance set out in the schedule attached to this policy, the excess of which would be payable under this policy except for terms and conditions of this policy which are not consistent with the underlying insurance, then notwithstanding anything in this policy to the

contrary, this policy is amended to follow and be subject to the terms and conditions of such underlying insurance in respect of such loss."[1]

The Housing Group was sued in September 1990 for various causes of action arising out of the allegedly defective construction of a home in San Ramon in 1983. By this time the primary Central Mutual policy had been exhausted by other claims. The policyholder requested a defense of the lawsuit. The defense was denied by the California Insurance Guarantee Association (CIGA), which, because Mission had been declared insolvent in 1987, now stood in Mission's shoes. After a defense verdict in the underlying action, The Housing Group brought this declaratory relief action for the costs of defending the underlying suit. After a trial on stipulated facts and exhibits, the judge awarded it damages and interest.

CIGA now appeals the judgment, contending that the broad as primary endorsement obviates the products exclusion in its policy only when a *particular* loss involves payment by *both* the primary and umbrella policies. The primary policy having been exhausted, CIGA contends, the underlying lawsuit here did not involve a potential loss which would have required payment by both policies; and, accordingly, the products exclusion in the umbrella policy would have been effective to preclude coverage.

We do not reach any issue concerning the products exclusion itself because the argument concerning the broad as primary endorsement is not persuasive.[2] The key language in this particular "broad as primary" endorsement is the phrase "a loss which is covered under the policies of underlying insurance." The umbrella insurer's argument rests on the assumption that the underlying primary Central Mutual policy did not "cover" the loss alleged in the underlying lawsuit because the broad as primary endorsement only applies when there is a single loss which requires the primary policy to pay something.

The word "cover," however, is itself ambiguous in the context of *this* insurance coverage case. In *Wells Fargo Bank* v. *California Ins. Guarantee*

---

[1] The original endorsement was entirely in capital letters.

[2] "Broad as primary" endorsements have not been the subject of much appellate court scrutiny. Only a small handful of cases even mention such endorsements. The typical context in which such endorsements play a role (if two cases can be said to make a typical context) is whether an excess insurer whose policy includes a broad as primary endorsement is bound to pay for a claim which was not covered by the primary policy when the excess policy was issued, but is covered by the primary after it was later reformed. (See *R.W. Beck & Assoc.* v. *City and Borough of Sitka* (9th Cir. 1994) 27 F.3d 1475; *L. E. Myers Co.* v. *Harbor Ins. Co.* (1979) 77 Ill.2d 4 [77 Ill.Dec. 823, 394 N.E.2d 1200].)

*Assn.* (1995) 38 Cal.App.4th 936, 948-949 [45 Cal.Rptr.2d 537], the court had the occasion to examine the meaning of the word "covered" in a dispute over whether a third level excess insurer would drop down to assume the obligations of a second level excess insurer which had become insolvent. The second level excess insurer's policy provided it would be liable only for the "net loss" over either (a) the underlying policy "in respect of each occurrence covered by" that policy, or (b) a $10,000 deductible "in respect of each occurrence not covered by" the underlying policy. The policyholder in *Wells Fargo* argued that the term "covered" as used in the second level excess insurer's policy, should have included the idea of the insurer *paying* for a loss as well as the idea of a loss simply being within the "scope" of that policy's protection. (See *Wells Fargo, supra*, 38 Cal.App.4th at pp. 940 & 948.)

Not so, said the *Wells Fargo* court. The ordinary dictionary definition of the verb "cover" means having " 'sufficient *scope* to include or take into account' " something. The noun "coverage" means " 'inclusion within *the scope* of an insurance policy or protective plan.' " (38 Cal.App.4th at p. 948, original italics, quoting Webster's New Collegiate Dict. (1977) pp. 262-263.) Thus a layperson would understand the phrases "covered by said underlying insurance" and "not covered by said underlying insurance," as used in the second level excess insurer's policy, to refer to the "*scope*" (*Wells Fargo* court's italics) of the underlying insurance, not whether the loss was *actually paid*. The court buttressed its conclusion by citing *Bernard Lumber* v. *Louisiana Ins. Guar.* (La.Ct.App. 1991) 563 So.2d 261, 266, which stated that coverage in such a context " 'refers to being insured against a specified risk or loss' " and " 'has nothing to do with "collectibility," or the ability to take in payment.' " (See *Wells Fargo Bank* v. *California Ins. Guarantee Assn., supra*, 38 Cal.App.4th at p. 949.)

In light of *Wells Fargo* (or, for that matter, the ordinary dictionary meanings of "cover") the phrase "a loss which is covered" should include a loss which is within the *scope* (our italics this time) of the underlying policy as well as actually paid by the underlying policy. And if the phrase does entail such losses, then there is nothing in the language of the broad as primary endorsement which confines the endorsement to just claims on which the underlying policy makes payment. The broad as primary endorsement would apply to *any* loss which was within the scope of the primary's coverage, regardless of whether there was actual payment.

The next question is whether such a reading is objectively reasonable, such that it would comport with how the insurer would believe the policyholder understood it. (See *Bank of the West* v. *Superior Court* (1992) 2

Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) The answer is yes; indeed, such a reading is the more reasonable of the two alternatives.

The usual course of events is that excess coverage begins *only after exhaustion*, and umbrella coverage fills in gaps left open by the primary insurance. (See *Wells Fargo Bank* v. *California Ins. Guarantee Assn.*, *supra*, 38 Cal.App.4th at p. 940, fn. 2.) CIGA's interpretation of the umbrella policy here does exactly the opposite—terminating with exhaustion of the primary and opening gaps otherwise closed in the primary. Hence it would be highly anomalous and counterintuitive for an umbrella policy to exclude a loss within the scope of the primary policy just because the primary policy's limits were exhausted.

More significantly, CIGA's interpretation would have the effect, where the broad as primary endorsement could make a difference, of exhausting the *umbrella* when any one claim exhausted the primary's limits, even though the umbrella's limits were otherwise untouched and even though the umbrella's limits never had been touched. The broad as primary endorsement would thus be of benefit to the policyholder only once—in the particular claim that used up the primary's limits *and* required some payout by the umbrella.

Finally, under CIGA's interpretation, its defense obligations would also be rendered illusory except for one claim—and maybe not even in that one—in situations where the broad as primary endorsement made a difference. Generally, an excess insurer has no duty to participate in a policyholder's defense until primary coverages are exhausted. (*Nabisco, Inc.* v. *Transport Indemnity Co.* (1983) 143 Cal.App.3d 831, 836 [192 Cal.Rptr. 207].) Yet CIGA would have us hold that the broad as primary endorsement does not apply unless the primary coverage is *not* exhausted. And by the same token, if the primary coverage was not exhausted, the primary insurer would *remain* reponsible for defenses expenses attributable to its coverage. (*Ibid.*) The effect would be to render the broad as primary endorsement almost, if not totally, meaningless.

CIGA further claims that applying the broad as primary endorsement to the underlying claim here violates the stricture against interpretations which make words redundant, in particular the words "the excess of" (as in the phrase "a loss which is covered . . . the excess of which would be payable . . ."). The point is not persuasive, however, because there is nothing in the word "excess" which *necessarily* requires *payment* by the underlying policy, as distinct from mere *coverage*. "Excess" can just as

easily mean the amount over zero (zero because of exhaustion) as it does the amount over any other number. Indeed, such a reading is buttressed by the juxtaposition of the word "covered" to apply to "a loss" under the underlying policy with the word "payable" to apply to the *umbrella* policy ("the excess of which would be payable under *this* [i.e., the umbrella] policy"). If the drafters had wanted to limit the broad as primary endorsement to situations where the "loss" was "payable," as distinct from "covered," they could have written, "In the event the insured suffers a loss which is *payable* under the policies of underlying insurance . . . ." The word was certainly at their disposal. They did not use it.

Along the same lines, CIGA argues that if the broad as primary endorsement is read to include claims where the primary is exhausted, then the "separate" exclusions of the umbrella policy are rendered void, which is contrary to the basic rule against interpretations which render words surplus. Thus CIGA asks why, if the intent was to have the umbrella "simply follow" the primary, did the umbrella contain its own set of exclusions? The answer, of course, is that the umbrella policy was a standard policy, and the policyholder might not have purchased a separate broad as primary endorsement. In that light it is obvious that the *whole point* of the broad as primary endorsement was to expand the umbrella so that its coverage *was* as "broad" as the primary's.

CIGA also contends the Mission policy was known (by whom it does not specify) as a "stand alone" policy which is meaningfully different from "following form" policies: "Stand alone" policies have their own terms and conditions which may vary from the primary. In this regard CIGA points to a separate "following form" endorsement in the Mission policy for real estate errors.[3] Why have a broad as primary endorsement, CIGA asks, when the same job might have been accomplished with a following form endorsement?

To the degree that CIGA's argument relies merely on the categorization of its policy as a "stand alone" policy, it is a mere tautology (i.e., the Mission policy was a stand alone policy, therefore it stood alone). CIGA points to

---

[3]The following form endorsement stated that the umbrella would not provide coverage for real estate errors "except insofar as coverage is available to the named insured in the underlying insurances," then went on to provide that "with respect to real estate professional liability," the terms of the underlying policy would be "incorporated hereunder" except those relating to premium, obligation to investigate, amount and limits of liability, any renewal agreement and any optional extension period.

nothing in the text of the policy which shows the umbrella was intended to stand alone after the inclusion of the broad as primary endorsement. Again, if Mission had designed the policy with the broad as primary endorsement to stand alone, it could have said so, instead of issuing an endorsement that would lead any ordinary person to believe that the umbrella's coverage was, to be literal about it, as "broad" as the primary's.

To the degree that CIGA's argument rests on the existence of the alternative of a following form endorsement, it fails because following form endorsements serve not only the function of conforming the coverage of an excess policy with that of the primary policy, but also typically exempt certain items as well. (See *Coca Cola Bottling Co.* v. *Columbia Casualty Ins. Co.* (1992) 11 Cal.App.4th 1176, 1183 [14 Cal.Rptr.2d 643], citing 2 Cal. Liability Insurance Practice: Claims & Litigation (Cont.Ed.Bar 1991) § 17.3, p. 17-5.) Following form endorsements often exempt items such as premium, liability limits, and the obligation to investigate or in some way defend. (See *ibid.*) Indeed, such exemptions were set forth in the following form endorsement used in *Coca Cola Bottling*, *supra*, 11 Cal.App.4th at page 1182, footnote 1 (limits and premium excepted), and in the case here (excepting premium, obligation to investigate, amounts and limits of liability, renewal agreements and optional extension periods). By contrast, the broad as primary endorsement here was a broader instrument which, on its face, exempted nothing, and used the sweeping phrase "notwithstanding *anything* in this [the umbrella] policy to the contrary." (Italics added.)

Finally, CIGA points to a provision of its policy which provides that "in the event of exhaustion" of the primary, the umbrella shall "continue in force as underlying insurance," "subject to all terms, conditions and definitions hereof."[4] From this text CIGA assumes when the primary exhausts, the umbrella's terms *without* the broad as primary endorsement control. This argument is not persuasive because there is nothing in the phrases "all terms, conditions and definitions hereof" or "continue in force as underlying insurance" which necessarily excludes the broad as primary endorsement. CIGA forgets that the broad as primary endorsement *itself* was part of the "terms, conditions and definitions" of the umbrella policy. If, in the event of primary exhaustion, the umbrella insurer had wanted the terms of its policy to revert back to what they *otherwise* might have been *without* the broad as primary endorsement, it could have said so.

---

[4] The relevant text from section III of the policy provided: "In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance by reason of losses pain thereunder, this policy subject to all the terms, conditions and definitions hereof shall [¶] (1) in the event of reduction pay the excess of the reduced underlying limit; [¶] (2) In the event of exhaustion continue in force as underlying insurance."

The judgment is affirmed. The Housing Group is to recover its costs on appeal.

Crosby, J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied July 23, 1996.